## Jefferson, et al. v. New York Life Insurance Co.

(Decided January 21, 1913.)

## Appeal from Fayette Circuit Court.

1. Insurance, Life—Contracts—What Law Governs.—Where an application for life insurance, procured in this State by an agent of a foreign insurance company, was forwarded to the home office, and the policy issued thereon was returned to the agent for conditional delivery, the policy so delivered is a Kentucky contract and is governed by the laws of this State.

2. Insurance, Life—Contracts—Definition of Terms.—As used in life insurance, "net value" of a policy is the "reserve," or that part of the annual premiums, paid by the insured, which, according to the American experience table of mortality, must be set apart to meet or mature the company's obligations to the insured, under the policy. "Dividend Additions" means paid-up insurance added to the original policy, and originated in the practice of issuing and appending to the original policy, a policy payable at death, for such an amount as the unused part of the dividend apportioned to the original policy would purchase, at a single premium.

3. Insurance, Life—Construction.—Where a policy of insurance is susceptible of a dual construction, that construction most favorable to the insured will be adopted. ·

4. Insurance, Life—Settlement.—The settlement of life policies, on which the premiums are in default, must be in accordance with the terms of the statute regulating such policies, unless the policy itself provides for a settlement more favorable to the insured than the statute, in which event the rights of the parties are determined by the contract.

5. Insurance, Life.—Where, by the terms of a life policy, upon the cessation of premium payments, the insured was entitled to extended insurance from date of default for such time as the excess of reserve over the indebtedness of the insured, if any, to the company, would purchase, at the then age of the insured according to the company's present published table of single premiums, the amount of such single premium cannot be augmented by any dividends, or by any part of the company's surplus, in the absence of any stipulation in the policy so providing, but is limited to the "reserve" less the indebtedness of the insured to the company, if any; and, if not sufficient to carry the insurance beyond the date of the death of the insured, no recovery can be had on the policy.

FORMAN & FORMAN, for appellants.

W. MARSHALL BULLITT, JAMES H. McINTOSH, ALEX. G. BARRET and BRUCE & BULLITT, for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

On December 19, 1902, the New York Life Insurance Company issued a policy of insurance for $2,500 on the

life of Thomas C. Jefferson, payable to his wife and children. It was an ordinary life, fifteen year accumulation or deferred dividend, policy. The annual premium was $132.28. The premiums for the years 1902, 1903, 1904, 1905 and 1906 were paid. On March 19, 1907, the insured borrowed from the company $312.00, executing his note therefor due December 19, 1907. The interest on this loan was paid in advance. The premium, falling due December 19, 1907, was not paid. The policy contains the following provisions, relative to the non-payment of premiums or interest:

"If any premium or interest is not paid on the date when due, and if there is an indebtedness to the company, insurance for the net amount that would have been payable as a death-claim on the date to which premiums were paid, will automatically continue from such date as term insurance for such time as any excess of the reserve held by the company under this policy over such indebtedness will purchase at the then age of the insured according to the company's present published table of single premiums for term insurance, and no longer."

On December 19, 1907, as admitted by the company, the net reserve on the policy was $329.55. It deducts the debt of $312.00 from this net reserve of $329.55, which leaves a balance of $17.55 due the insured and applicable, under the terms of the policy, to the purchase of extended insurance, at a single premium rate, in the sum of $2,500. This sum of $17.55, at the company's single premium rate, would serve to keep alive insurance, in the amount of $2,500 to March 19th, 1908, and no longer. The Company pleads that it fully complied with its contract; and that, on and after March 19, 1908, the rights of the insured, under the policy, ceased. The insured died on October 19, 1908. The beneficiaries, under the policy, his wife and children, brought this action to recover the amount of the insurance. Their position is that, when the premium was not paid on December 19, 1907, the policy should have been extended, not merely for the length of time that the net reserve of $329.55 less the debt of $312.00, or a balance of $17.55 would have carried it, at a single premium rate, but that there should have been added to this net reserve on the policy its proper share of dividend earnings, and this, as well, should have been applied to the purchase of extended insurance. It is conceded that $56.00 of such additions, if allowed, would have kept the

policy alive up to the date of the insured's death. The beneficiary endeavored to show that the dividends, accumulated upon the policy but not apportioned to it, were more than this sum. It is shown by the testimony of Mr. Hunter, the actuary of the company, that the dividends paid upon the policies for $2,500, like in age and all respects to that carried by the insured in this case, save that they call for annual instead of deferred dividends, were in 1903, $10.57; in 1904, $11.20; and in 1905, $12.35. The amount of dividends on such policies was not fixed by this witness for either of the years 1906 or 1907. C. B. Bullock, an actuary connected with the Insurance Department of the State, testifies that upon like basis, the dividends upon such a policy would have been, for 1906, $13.40 and for 1907, $14.87. The total of these sums is $62.39, or $6.39 in excess of the sum which the company admits would have carried the extended insurance to a point beyond the death of the insured. Under the provisions of the contract, the insured was not entitled to have any dividend earnings applied towards the purchase of extended insurance, but only that portion of the reserve which remained, after his indebtedness to the Company was deducted. But, it is insisted that the contract of insurance is a New York contract, and is, therefore, controlled and regulated by the statutes in the State of New York; and such statutes must be read in connection with the policy, and when so read, the dividend additions are to be regarded or treated as a part of the reserve. The company denies that the contract is a New York contract, and insists that the New York statute, not being made a part of the contract of insurance or incorporated in it, has no application. It, therefore, becomes necessary first, to determine whether the contract of insurance in suit is, in fact, a Kentucky or a New York contract. It is averred by the company, in its answer, that the insured, at the time he applied for this insurance, lived in Kentucky; the agent, who solicited it, likewise lived in Kentucky; the application was made, the policy delivered, and all the premiums were paid in Kentucky. It is insisted that, all of these facts concurring, the policy must be considered a Kentucky contract. The representatives of the insured insist that it is a New York contract, first, because Jefferson paid the initial premium at the time he made the application, on December 19, 1902, and that this application was accepted in New York and the policy issued there

and forwarded to the agent in Kentucky for delivery, and there was no limitation, restriction, or condition, coupled with its delivery to the agent by the company, and that this, therefore, makes it a New York and not a Kentucky contract. Upon these two points, counsel for the respective parties do not agree. It is insisted by counsel for the company that the evidence does not support the contention of appellants on either proposition. The chancellor, upon consideration of the pleadings and proof, was of opinion that the fund, applicable to the purchase of extended insurance at the date of the non-payment of the premium: to-wit: December, 1907, was not sufficient to keep the policy in force, as extended insurance, until the date of the death of the insured, and that the policy, prior to said date, had become ineffectual and void and dismissed the petition. The plaintiffs appeal.

A determination of the question as to whether the contract is a Kentucky or a New York contract becomes of primary importance. The position taken for appellants as to the time of the payment of the initial premium and the instructions and directions, which were given to the local agent at the time the policy was forwarded to him for delivery, must both be borne out by the evidence, or else the contention that it is a New York and not a Kentucky contract must fail. As to the payment of the premium, the only evidence upon this point is that of the witness, T. V. Forman, the soliciting agent for the company. He testifies, that, upon the date that he took this application, he took a note of the insured payable to himself for the amount of the premium, due at sixty days, without interest. He also testifies that he had no authority to accept a note on behalf of the company, or to deliver a policy except for cash, and that the taking of the note was a purely personal transaction between himself and the insured. That the note was not taken for the company is made clear by his cross-examination, which is as follows:

"Q. 95. That was purely a matter between you as an individual and Mr. Jefferson,—the company had nothing to do with that?

"A. That is so.

"Q. 96. That was just a private, personal, arrangement between you and Jefferson, and the company had absolutely nothing to do with that delivery, did it?

"A. I think that I would have shown that note to

the branch office to see if it was satisfactory, or confer with the cashier or agency director in regard to taking the note.

"Q. 97. Didn't you say a little while ago that the company would not accept a note, and that you had to furnish the cash to them?

"A. I said I conferred possibly with Tucker and the agency director as to the advisability of accepting the note.

"Q. 98. That was from your standpoint and not from the company's?

"A Yes.

"Q. 99. You mean that you possibly conferred with them whether you could afford to credit Mr. Jefferson with that amount of money?

"A. That is correct.

"Q. 100. I say, therefore, the arrangement of taking this note was purely a personal matter between you and Mr. Jefferson.

"A. I would say it was."

Not only does this evidence show that, in taking the note of the assured when the application was made, the agent was acting in his individual capacity, but the record further discloses the fact that this note was never delivered to the company, or offered to be delivered to it by the agent, but, on the contrary, the agent paid to the company the premium on this policy immediately after the policy was delivered by him and made no mention of the note. The evidence entirely fails to support the contention of appellant's counsel that the premium was paid when the application for the insurance was made. The claim that the application was accepted in New York and the policy issued and forwarded to the agent in Kentucky for delivery, without conditions, is rested upon the statement of Mr. McCall, witness for the company, in which he says that, on December 26, 1902, the policy was forwarded to the company's agent in Lexington, for unconditional delivery to the insured, but, in a later deposition, this statement is explained as follows:

"I should have spoken more accurately if I said the policy was forwarded without any special restrictions to the cashier about its delivery, other than the standing instructions of the company, for this is what I meant."

He then explains the standing instructions to be

these: "A policy must, under no circumstances, be delivered unless the premium has been paid to the agent. This rule must be rigidly adhered to in all cases; and agents are not authorized to accept premium notes, or anything except cash in payment of the whole, or any part, of the premium. The agent must not accept the premium and deliver the policy, if any material change has taken place in the applicant's health since he was examined."

When his first statement is read in connection with his amplified statement, it is apparent that the policy was forwarded by the home office to the agent at Lexington, under the rules and regulations governing them in the conduct of their business, and these rules required, as stated, that the agent was to deliver the policy only under specified conditions, and not otherwise. So that the question as to whether or not the policy should be delivered by the local agent could be determined only when the attempted delivery was made. If there was then no material change in the health of the applicant, and the requirements of the company as to the payment of the first premium complied with, he was authorized to deliver the policy, and not otherwise. Under these circumstances, the policy was not forwarded by the home office to the local agent to be delivered by him without conditions or limitation. It was a Kentucky contract; and the New York statutes, having no extra-territorial force or effect, cannot be considered in determining appellant's rights. These rights must be determined by the contract of insurance as expressed in the policy when read in the light of the Kentucky Statutes.

If the settlement, or contract arrangement for settlement, provided for in the policy, is less favorable to the insured than the Kentucky statute provides it should be, then the contract must be so modified as that the company will be required to settle upon terms as favorable as the statute provides the contract shall be made. The only Kentucky statute bearing upon the rights of an insured, when he has ceased to pay his premiums, is section 659, which provides as follows:

"All policies hitherto issued by any domestic life insurance company shall be subject to the provisions of law applicable and in force at the date of such issue.

"Subdivision two: No policy of life or endowment insurance upon the ordinary plan hereafter issued by

any domestic life insurance company shall become forfeit or void, for non-payment of premiums, after three full years' premiums, in cash, have been paid thereon; but, in case of default in the payment of any premium thereafter, then, without any further stipulation or act, except, as herein provided, such policy shall be binding upon the company for the amount of paid-up insurance, which, according to the company's published tables of single premiums, the net value of the policy on such anniversary, and all dividend additions thereon computed by the rule of section 116 of the act, to which this is amendatory, and which section is section 653, Kentucky Statutes, will purchase as a net single premium for life or endowment insurance maturing and terminating at the time and in the manner provided in the original policy; and such default shall not change or affect the condition or terms of the policy, except as regards the payment of premium and the amount payable thereon; provided, however, that any company may contract with its policy-holders to furnish, in lieu of the paid-up insurance provided for in this section, any other form of life insurance lawful in this Commonwealth, of not less value.

"The reserve for such paid-up insurance shall not be less than two-thirds of the reserve of the original policy; but, any outstanding indebtedness on account of said policy shall operate to reduce the said paid-up insurance in proportion to its ratio to the reserve of such paid-up insurance computed by the rule of section 116 of the act, to which this is amendatory, and which section is section 653, Kentucky Statutes.

"Every such policy, after the payment of three full years' premium thereon, in cash, shall have a surrender value, which shall not be less than seventy per cent of the reserve that would be required for the aforesaid paid-up insurance, after deducting for any indebtedness as above provided, computed by the rule of section 116 of the act, to which this is amendatory, and which section is section 653, Kentucky Statutes.

"Subdivision four: In construing the provisions of this act, ordinary insurance, or insurance upon the ordinary plan, shall be considered to be insurance which may be paid for by annual premiums, or by semi-annual, or quarterly, or other installments thereon at the option of the company, * * *

"Any condition or stipulation in the policy of insurance or elsewhere, contrary to the provisions of this section, and any waiver of such provisions by the assured, shall be void."

The statute plainly provides that, after three full annual premiums have been paid, in cash, if the insured ceases to pay his premiums, the policy shall become a claim against the company for the amount of paid-up insurance which the net value of said policy on that date, when supplemented by all dividend additions thereon, will purchase of life or endowment insurance maturing at the same time and manner as the original policy. The net value of a policy is provided for by section 653, Kentucky Statutes, and is but another name for "reserve," and means that part of the annual premiums paid by the insured which, according to the American experience table of mortality, must be set apart to meet or mature the company's obligations to the insured. This net value, or reserve, can always be determined with mathematical precision; and, among those at all familiar with insurance and the technique of that business, there is no dispute as to how the net value of a policy is determined. The net value of a policy, on any given date, is its actual value on that date, its reserve, Hence, when the insured failed to pay his premium on December 17, 1907, under the terms of his contract, he was entitled to extended insurance for such time as the reserve, or net value of the policy, would have carried $2,500, when applied as a single premium, according to the company's published tables. He was also entitled to have the net value, or reserve, supplemented by the value of any dividend additions to his policy.

There had been no dividend apportioned to his policy for, under its terms, it belonged to that class known as "deferred dividend" policies, and no dividend could have been apportioned to it until it had been in force for fifteen years, the period when, by the terms of the policy, dividends should be apportioned to it. The term "dividend addition" is perhaps more frequently misapplied than any other term used in connection with insurance. It means something added to the policy, in the shape or form of paid-up insurance. The term originated in this way: When a dividend was apportioned to a policy and not drawn by the policyholder in cash, or used by him in reducing his premium payments, the

company would issue to the insured a paid-up policy, payable at his death, for such an amount as the dividend, applied as a single premium, would buy; and this little policy, fully paid-up, was appended to the original policy and was called a "dividend addition" to the policy. It, in no sense, represents unapportioned assets, or surplus, of the company, but has reference solely to paid-up insurance.

It is not contended that there were any dividend additions to the policy under consideration; so that, under both the contract and the statute, the only item which is to be taken into account, in determining the question at issue, is the "net value" of the policy when the insured ceased to pay his premiums. It is admitted by the company that this was $329.55; and this is the amount that, under both the contract and the statute, should have been applied to the purchase of extended insurance, had the insured not been, at that time, indebted to the company; but, being indebted, the net value is reduced by the amount of the indebtedness, or $312.00, leaving $17.55 to be applied to the purchase of extended insurance.

It is insisted for the representative of the insured that, although no dividends had been apportioned to his policy, still the company, during the years that his policy remained in force, had been accumulating a surplus and that he should be permitted to participate in this surplus, notwithstanding his contract did not provide for a distribution of any surplus to it until it had been in force for fifteen years; and that, as a matter of right, the company should be held answerable to the insured for such an interest in its surplus as had been apportioned, during these same years, to similar policies of like amounts upon which it was paying dividends. A sufficient answer to this claim is found in the fact that the contract of insurance does not give him this right, and the statute does not require that it should. The assured was not entitled to have a dividend apportioned to his policy until it had been in force for fifteen years. When he ceased to meet his premium payments, he was, under the statute, entitled to paid-up insurance for such an amount as the reserve on his original policy would buy; and the statute requires that the reserve on the paid-up policy, so issued, should be not less than two-thirds of the reserve on the original policy. The statute

also requires the company to give to the assured, who has defaulted in the payment of his premiums, a paid-up policy in all cases where a different form of insurance is not requested by the assured, or provided for in the contract; and it further provides that, where insurance, other than paid-up insurance, is provided for and furnished, it must be upon terms equally as favorable. It is not denied that the reserve on the policy for extended insurance was not more than two-thirds of the reserve on the original policy. Indeed, it could not well be, for the record shows that the full amount of the reserve was applied to the purchase of extended insurance. Hence, since the contract, as provided for under the policy, is even more favorable to the insured than the statute requires it should be, the rights of the parties are to be measured by the provisions of the policy alone.

The policy is the contract entered into by the assured with the company. Its terms express their agreement, and by its provisions each is bound. There is nothing peculiarly sacred about a contract of insurance, which places it upon a plane above, or different from, that upon which other contracts rest. If any of its provisions are complicated or involved, so as to render them susceptible of a dual construction, courts have uniformly adopted that construction most favorable to the insured; but, when the contract is free from ambiguity, there is no room for construction and it is the plain duty of the court to enforce it as written. Here the contract provided that, in consideration of a certain sum to be paid annually by the insured, the company obligated itself to pay, upon the death of the insured, the sum of $2,500. It further provided that, if the contract should be kept in force for fifteen years, dividends should be apportioned to it out of the earnings of the company. Thus, under the plain provisions of this contract, in order for the assured to be entitled to have dividends apportioned to his policy, it was essential that it should have been in force for fifteen years. If he paid his premiums for this time, he was entitled to have dividends apportioned to it; if he failed to do so, he lost his right in this particular. In another clause of the policy, provision is made for extended insurance, in the event the payment of premiums were discontinued after three full annual premiums had been paid, in cash. The obligations of the company, under this provision of the contract, was to

apply the net value, or reserve, of the original policy to the purchase of extended insurance. No right, under this clause of the contract, is given the assured, in the event he ceases to meet nis premium obligations, to have any portion of the surplus of the company applied, along with the reserve, to the purchase of paid-up insurance; and the trial court did not err in so holding. Most insurance companies write different kinds of insurance, that is, policies upon different plans. Each kind has its own peculiar, distinguishing features. The premiums are much lower upon some than upon others; and the rights of the insured vary under the different forms or classes of insurance. These facts are taken into account by the contracting parties, and in most, if not all, cases, exercise a controlling influence in making the contract. A deferred dividend policy cannot be treated by either the company or the assured, as though it was an annual dividend policy, any more than an ordinary life policy could be held to be subject to the provisions of a term policy. It is altogether probable that, in accepting a deferred dividend policy, the assured secured rights which he could not have secured under an annual dividend policy; and, undoubtedly, corresponding rights accrue to the company, one of which was that providing that, unless the contract was kept in force by the insured until the dividend period arrived, it would not be accountable to the assured for any dividends thereon. The contract upon this point is plain. No dividends were to be apportioned to the policy until it had been in force for fifteen years. By carrying out his contract and paying his premium annually for fifteen years, if he had lived that long, the assured would have been entitled to participate in the dividend distribution then made, but not otherwise. He was not entitled to participate in the surplus of the company before the expiration of that time. There were no dividend additions to his policy, and the company gave him the full benefit of the net value, or reserve, of his policy, after deducting his indebtedness to it, in the purchase of extended insurance. This is all that he was entitled to, and it did not keep his insurance in force till his death.

Judgment affirmed.

Whole court sitting—Judge Nunn dissenting.